UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

| | | |
|---|---|---|
| T PENINSULA AXIS VA, LLC, | ) | |
| T PENINSULA HOTEL VA, LLC, | ) | |
| PENINSULA PARKING LOT VA, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No.: _____ |
| | ) | |
| PENINSULA TOWN CENTER | ) | |
| COMMUNITY DEVELOPMENT AUTHORITY, | ) | |
| **Serve**: Registered Agent | ) | |
| Vincent J. Mastracco | ) | |
| Kaufman & Canoles, PC | ) | |
| 150 W. Main Street, Ste. 2100 | ) | |
| Norfolk, VA 23510 | ) | |
| | ) | |
| CITY OF HAMPTON, | ) | |
| **Serve**: City Attorney | ) | |
| Cheran Cordell Ivery | ) | |
| 22 Lincoln Street, 8th Floor | ) | |
| Hampton, VA 23669 | ) | |
| | ) | |
| WELLS FARGO BANK, N.A., | ) | |
| **Serve**: Registered Agent | ) | |
| Corporation Service Company | ) | |
| 100 Shockoe Slip, Fl. #2 | ) | |
| Richmond, VA 23219 | ) | |
| | ) | |
| MUNICAP, INC. | ) | |
| **Serve**: Registered Agent | ) | |
| Virginia Professional Services, LLC | ) | |
| 3850 Gaskins Road, Ste. 120 | ) | |
| Richmond, VA 23233 | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT

T Peninsula Axis VA, LLC ("Peninsula Axis"), T Peninsula Hotel VA, LLC ("Peninsula Hotel"), and Peninsula Parking Lot VA, LLC ("Peninsula Parking") ("Plaintiffs" or the "Peninsula Entities," or "POE"), for their Complaint against Peninsula Town Center Community

1

Development Authority (the "CDA"), City of Hampton, Virginia (the "City"), Wells Fargo Bank, N.A. ("Wells Fargo"), and Municap, Inc. ("Municap"), state as follows:

**<u>Parties</u>**

1.      Peninsula Axis is a Texas limited liability company owned by Texas liability companies and a trust, the trustee of which is a Texas resident with all beneficiaries also being Texas residents.

2.      Peninsula Hotel is a Texas limited liability company owned by Texas liability companies and a trust, the trustee of which is a Texas resident with all beneficiaries also being Texas residents.

3.      Peninsula Parking is a Texas limited liability company owned by Texas liability companies and a trust, the trustee of which is a Texas resident with all beneficiaries also being Texas residents.

4.      The CDA is a community development authority created by the City of Hampton pursuant to the enabling legislation in Sections 15.2-5152, 5103 and -5107 of the Code of Virginia, with a registered agent and principal office in Norfolk, Virginia.

5.      The City of Hampton, Virginia is a political subdivision of and locality within the Commonwealth of Virginia subject to service of process on its City Attorney pursuant to Section 8.01-300(1) of the Code of Virginia.

6.      Wells Fargo is a stock corporation incorporated outside the state of Virginia and with a principal office in Sioux Falls, South Dakota.  Wells Fargo is the Trustee as defined in the MOU.

7.      Municap is a stock corporation incorporated in Maryland with a principal office in Columbia, MD and registered agent in Henrico County, Virginia.  Municap is the Administrator of the CDA as set forth in the MOU.

## Jurisdiction and Venue

8.      This is a civil action over which this Court has jurisdiction pursuant to 28 U.S.C. § 1332.   As required by 28 U.S.C. § 1332, at the time the Complaint was filed, complete diversity of citizenship existed between each of the Plaintiffs and Defendants.   Plaintiffs are Texas limited liability companies owned by limited liability companies and a trust with a trustee that is a Texas resident and all beneficiaries are Texas residents.   The City is a Virginia locality and the CDA is a division of Virginia.   Both Wells Fargo and Municap are incorporated, and with a principal office, outside of Virginia.   Accordingly, Plaintiffs are citizens of a different state from Defendants.

9.      The amount in controversy exceeds $75,000, exclusive of interest and costs.

10.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(1) and (2) and also under Virginia Code § 8.01-261(15) and pursuant to Section 12.9 of the MOU as defined herein.

11.      Defendants are subject to personal jurisdiction in Virginia because their registered agents are located in Virginia.   They are also subject to personal jurisdiction in Virginia pursuant to Virginia Code §§ 8.01-328.1(A)(1).

## Introduction

12.      In addition to the tens of millions paid to acquire its interests, the Peninsula Entities and their affiliates have invested in excess of $65 million dollars in the successful revitalization of the Peninsula Town Center.   In total, the Peninsula Entities have invested in excess of $115 million dollars to acquire and revitalize the Peninsula Town Center.    The Peninsula Entities have also stood behind the immediate future success of the Peninsula Town Center by posting a $1.7M fund with Wells Fargo (the "Trustee").

13.     Despite the current viability of the Peninsula Town Center, and the success of the Peninsula Entities' efforts, the Peninsula Entities stand to lose this $1.7M fund through several recent unilateral actions of the City, CDA and/or its agent and Administrator, Municap,

14.     This aim of this lawsuit is to stop or recover the loss of the $1.7M fund that rightfully belongs returned to the Peninsula Entities.

## Facts

15.     In 2006, the City created the CDA and the Peninsula Town Center Community Development Authority District (the "District").   The District is commonly known as the "Peninsula Town Center" and consists of   approximately 77 acres of land situated in a commercially developed area within the City on a site located near the southern end of the Virginia Peninsula in the Hampton Roads region of Virginia.

- ***The Peninsula Town Center Financial Background***

16.     On September 6, 2007, the CDA issued its $92,850,000 Special Obligation Bonds, Series 2007 (the "2007 Bonds"), pursuant to that certain Indenture of Trust dated as of September 1, 2007 (the "Original Indenture"), between the CDA and Wells Fargo, as trustee (the "Trustee"), the net proceeds of which were made available to finance the costs of public improvements.

17.     The 2007 Bonds are payable from (i) special assessments levied on the taxable parcels within the District, (ii) a special ad valorem tax levied on the taxable parcels within the District, and (iii) a portion of certain incremental tax revenues pledged to the payment of the 2007 Bonds.

18.     The improvements contemplated incident to the issuance of the 2007 Bonds were completed and the grand opening of the District occurred in 2010.   The original development

within the District, unfortunately, was not sufficient to support full payment of the 2007 Bonds and the taxable parcels in the District were charged an *additional* "special assessment."

19.     For example, in the year 2011 alone, the additional special assessment attributable to the 2007 Bonds was in excess of five million dollars.  Material annual shortfalls and excessive special assessments continued until the 2007 Bonds were refunded in August 2018 (as described below).

20.     By 2014, due in large part to the excessive special assessments, the original developer of the District defaulted on its loans and HSBC, original developer's lender, foreclosed upon all property in the District, other than the parcel owned by Target Corporation ("Target"), J.C. Penney Properties, Inc. ("JCP"), and the public improvements owned by the CDA.

21.     In October 2014, Plaintiffs, the Peninsula Entities (which includes affiliates and predecessors under common control), purchased all property within the District owned by the original developer, excluding the Target, JCP, and CDA parcels.  To revitalize the District, the Peninsula Entities incurred hundreds of thousands of dollars to explore the refunding of the 2007 Bonds.

- ***The MOU and Additional Reserve Fund***

22.     In April 2018, the City, CDA, and the Peninsula Entities entered into an Amended and Restated Memorandum of Understanding (the "MOU") to begin the process of refunding the 2007 Bonds.  The goal of this process was to drastically reduce shortfall special assessments charged to the taxable parcel owners which in turn would significantly increase the long-term viability of the District.  The MOU is attached hereto as **<u>Exhibit A</u>** and incorporated herein.

23.     In summary, the essence of the MOU, and related bond documents, is that new 2018 bonds in the amount of $77,800,000 (the "2018 Bonds") would be issued to repay and replace the 2007 Bonds upon certain terms including:

a.  the Peninsula Entities would develop and redevelop, or would cause to be developed or redeveloped, portions of the District in three phases which included (the "Additional Development"), (i) *Phase I* – ~34,000 square feet of retail space *and* 23 Class A apartment units, (ii) *Phase II* – ~103,000 square feet of retail space, and (iii) *Phase III* – A 126-room hotel *and* 162 Class A apartment units;

b.  the Peninsula Entities would pay down bond balances [the Peninsula Entities paid down in excess of $5.5 million in 2007 Bonds prior to and as part of refunding]);

c.  the Peninsula Entities would deposit various reserves with the Trustee [including a $10,000,000 construction escrow (the "Construction Reserve") and a **$1,700,000 "Additional Reserve Fund"**)] as security for completion of the Additional Development.

24.     After nearly two years of effort and expense by the Peninsula Entities, the 2018 Bonds were issued in August 2018, refunding the 2007 Bonds.  The Peninsula Entities timely completed the Additional Development, the Construction Reserve was released to the Peninsula Entities, and the only remaining monies to be addressed by the MOU and related documents is the release of the Additional Reserve Fund.

25.     The release of the Additional Reserve Fund is described and defined in the Amended and Restated Indenture of Trust dated July 1, 2018 (the "Indenture"), which amended and restated the Original Indenture and is incorporated by reference into the MOU.  The Indenture is attached as **Exhibit B**.

26.     The Indenture contemplates that the Additional Reserve Fund is to be returned to the Peninsula Entities on September 15, 2020, pursuant to the terms and conditions of the MOU and Indenture.  Section 7.9(a) of the Indenture provides in pertinent part as follows:

Section 7.9 Additional Reserve Fund. (a) The Trustee shall hold in trust the amount in the Additional Reserve Fund until September 15, 2020, on which date the Trustee shall transfer the amount to POE at the written

direction of an Authorized POE Representative provided that (i) … : (ii) (A) the Administrator has analyzed the First Available Pledged Revenues projected to be received from the CDA District based on the conditions existing on August 31, 2020, and has determined that the average annual First Available Pledged Revenues for each of the 12-month periods ending on September 1 of 2021, 2022 and 2023 will be not less than 95% of $4,676,000, or (B) …[1]

27.     The significance of using "First Available Pledged Revenues" is that the First Available Pledged Revenues was a projection of future available revenues based upon certain assumptions and limitations set forth in the Limited Offering Memorandum ("LOM") used in conjunction with the issuance of the 2018 Bonds.  Relevant portions of the 1054 page Limited Offering Memorandum ("LOM") are attached as **Exhibit C**.

- ***The Administrator's projections***

28.     The Peninsula Entities asked the Administrator, *i.e.*, Defendant Municap, Inc., to prepare a projection of First Available Pledged Revenues in anticipation of the August 31, 2020 determination contemplated by Section 7.9(a) of the Indenture.  The projections were received in December 2019.

29.     The Administrator prepared the summary of projected First Available Pledged Revenues for each of the 12-month periods ending on September 1 of 2021, 2022 and 2023 (the "December Projection").  The December Projection is attached as **Exhibit D**.

30.     As of December 2019, the projected revenues were sufficient for the Additional Reserve Fund to be released to the Peninsula Entities. The December 2019 Projection anticipated First Available Pledged Revenues of $4,665,900, an amount that exceeded the $4,442,200 threshold by $223,700, and would have merited a release of the $1.7M Fund to the Peninsula Entities.

---

[1] The Peninsula Entities completed the Additional Development by August 31, 2020 in accordance with Section 7.9(a)(i) of the Indenture.  The remaining issue governing return of the Additional Reserve Fund is whether the First Available Pledged Revenues meet the threshold.

31.     At some time during the first half of 2020, unbeknownst to the Peninsula Entities, the City unilaterally reduced the assessed value of the District parcels owned by Target and JCP. The reduced assessed value significantly reduced the real estate taxes.  As a result, the First Available Pledged Revenues also decreased.

32.     On August 27, 2020, the Administrator prepared a draft of the contemplated August 31, 2020 projected First Available Pledged Revenues for each of the 12-month periods ending on September 1 of 2021, 2022 and 2023 (the "August Draft").  The August Draft is attached as **Exhibit E**.

33.     In the August Draft, the First Available Pledged Revenues were shown to be **below** the threshold necessary to release the Additional Reserve Fund to the Peninsula Entities. The August Draft anticipated First Available Pledged Revenues of $4,288,562, an amount below the $4,442,200 threshold by ($153,638), and would result in application of the $1.7M Fund to the 2018 Bonds and not a release to the Peninsula Entities.

34.     The Peninsula Entities informed the Administrator of several errors based on inaccurate or missing information in the August Draft projections.  The Administrator agreed with most of them, but as of the preparation of this Complaint, has not provided a draft incorporating the revisions.  The Peninsula Entities also asserted to the Administrator and CDA that the August Draft omitted required assumptions and limitations.

35.     The Peninsula Entities have and continue to assert three errors in the projected First Available Pledged Revenues:

(1) the projected First Available Pledged Revenues have not been prepared in conformity with Section 7.9(c) of the Indenture;

(2) the unilateral decrease of the assessed value of the Target and JCP parcels by the City materially and adversely reduced the First Available Pledged Revenues, notably without actually reducing the amount that Target and JCP must pay for the combined real estate taxes and assessments; and

(3) Administrator has assumed in its projections that various parcels are currently stabilized when they are - in fact - not yet stabilized (thereby materially and adversely understating assessed values and tax revenues for multiple years); Administrator has failed to consider multiple tenants in their projections (thereby materially and adversely understating sales tax revenues); and Administrator has failed to include estimated, ramp up increases in sales of various tenant (thereby materially and adversely understating sales tax revenues).

36.     To assure that the August 31, 2020 calculation of First Available Pledged Revenues was consistently applied, the parties to the MOU and Indenture agreed that the First Available Pledged Revenues would be prepared using the same assumptions and limitations used in Chapter XIV of the Tax Increment and Special Assessment Report contained in the LOM. Section 7.9(c) of the Indenture states in pertinent part:

> In preparing the projections of First Available Pledged Revenues as required under **[7.9]**(a) above, ***the Administrator shall operate under the assumptions and limitations set forth in Chapter XIV of the Tax Increment and Special Assessment Report*** …".  (emphasis added).

37.     Chapter XIV of the Tax Increment and Special Assessment Report accompanying the LOM ("Chapter XIV") is attached in **<u>Exhibit C</u>**, and includes the following assumptions and limitations the Administrator shall use in preparing the projection of First Available Pledged Revenues:

> Other assumptions made in the preparation of this report and limiting conditions to this report are as follows:
>
> 1.   There are no … other federal, state, or local laws, regulations, or codes that would prohibit or impair the … operation of the subject properties in the manner contemplated in this report ….
>
> 2.   No material changes will occur in … any federal, state or local law, regulation or code affecting the subject properties ….
>
> 3.   The local, national and international economies will not deteriorate ….
>
> 5.   The subject properties will not be subjected to any war, … or other casualty or act of God.
>      …

38.     The CDA appears to agree with the Peninsula Entities that the projections should be prepared consistent with the LOM.  See **Exhibit F** Email from Arthur Anderson, counsel for the CDA, dated September 1, 2020 ("If MuniCap would have included the projected revenues from such a business in preparing the Tax Increment and Special Assessment Report . . . then I do not see a problem in including such revenues in the August 31, 2020 . . . projections").

39.     In practice, however, the CDA has not directed the Administrator to prepare the August Draft projections in compliance with the Chapter XIV Assumptions in the LOM, as required by Section 7.9(c)(c) of the Indenture.

- ***The Administrator's COVID Factor improperly reduces the projections***

40.     The Administrator has expressly conditioned the August projection on the COVID-19 Pandemic.  See Exhibit E, p.1 "Updates to Projections in LOM (Scenario A): . . . "Adjusted Calendar Year 2020 Sales for COVID-19 Pandemic Conditions as of August 31, 2020").

41.     The Administrator has applied a "COVID Factor" of -8.86% to Sales tax, -8.64% to Meals tax, 56.30% factor to Amusement tax.  See Exhibit E, Appendix A-1.

42.     The Administrator then assumes that sales in 2021 will go back to the 2019 pre-pandemic levels plus 2%, which would mean that not only was the 2020 projection decreased due to COVID Factor but the expected 2% increase for 2020 is missing, and the failure to increase in 2020 has a cumulative effect on all future years.  Put another way, the failure to include the 2% increase in 2020 means all years thereafter are at least 2% lower than they should have been when compared to the assumptions made in the prior reports.

43.     The assumptions and limitations in Chapter XIV prohibits application of the COVID Factor.

44. The Administrator has acknowledged to the Peninsula Entities that <u>if</u> COVID 19/ government actions, and aggregate the effects thereof, were removed from the August Draft, <u>then</u>:

(i) the projected September 1, 2022 First Available Pledged Revenues would have been used in the year ended September 2021;

(ii) the projected September 1, 2023 First Available Pledged Revenues would have been used in the year ended September 2022; <u>and</u>

(iii) the projected September 1, 2023 First Available Pledged Revenues would have been 2% greater than the First Available Pledged Revenues for the year ended September 2022.

The net effect results in an average increase of $197,706 over the three years and the increase results in the Peninsula Entities receiving the Additional Reserve Fund (as shown below):

| Period | Projected First Available Pledged Revenues | | Adjusted Projected First Available Pledged Revenues | | "COVID-19 Impact" | |
|---|---|---|---|---|---|---|
| 9/1/2021 | $ | 3,993,014 | $ | 4,376,463 | $ | 383,449 |
| 9/1/2022 | $ | 4,376,463 | $ | 4,496,208 | $ | 119,745 |
| 9/1/2023 | $ | 4,496,208 | $ | 4,586,132 | $ | 89,924 |
| Average | $ | 4,288,562 | $ | 4,486,268 | $ | 197,706 |
| Threshold Pursuant to Indenture: | | | | 4,442,200 | | |
| Amount Above (Below) Threshold: | | | $ | 44,068 | | |

45. Without imposition of the COVID Factor, the First Available Pledged Revenues exceed the threshold by $44,068 and merit a return of the $1.7M Fund even without considering the other errors.

46. As of the preparation of this Complaint, the Administrator has asserted that it has not, and will not, prepare the projections in accordance with the assumptions and limitations in Chapter XIV. <u>See</u> Correspondence, incorporated herein as **Exhibit G**.

- ***The City's decreased assessments improperly reduce the projections***

47.     First Available Pledged Revenues is comprised of several components including real estate taxes and special tax revenue, both of which are determined based upon a parcel's assessed value.  Notably, the calculation of First Available Pledged Revenues does not, however, include the Annual Payment A special assessment described in the bond documents.

48.     Due to the nature of the 2018 Bonds, the aggregate amount of real estate taxes (including special tax revenue) and special assessments (e.g., Annual Payment A) to be paid by a landowner in the District to the City is not affected by a decrease in the assessed value of such landowners' parcel *if* an "Annual Payment A" special assessment is or will be assessed.  Put another way, if a landowner is already going to owe an Annual Payment A special assessment, then lowering the assessed value of said landowners parcel, and the corresponding decrease in real estate taxes/ special tax revenue assessment, will only cause a dollar-for-dollar increase in the Annual Payment A special assessment.

49.     Under the 2007 Bonds and now under the 2018 Bonds, Target and JCP have always been required to pay an Annual Payment A special assessment.  This means that the decrease of the assessed value of the Target and/or JCP parcels (i.e., resulting in a decrease of the real estate taxes and special tax assessment) only results in an increase in Annual Payment A special assessment.  Accordingly, a "decrease in assessed real estate value" does not benefit Target or JCP, but decreasing the assessed real estate value of Target and JCP will decrease the First Available Pledged Revenues.

50.     The assumptions and limitations used in the LOM projections to calculate First Available Pledged Revenues included that neither the Target nor JCP parcels would decrease in assessed value and – in fact – those parcels were projected to increase in assessed value by 2% per annum.

51.     As described above, in the first half of 2020 – notably after Municap determined in December 2019 that First Available Pledged Revenues were on target to trigger the release of the Additional Reserve Fund to the Peninsula Entities -- the City unilaterally reduced the assessed value of the District parcels owned by Target and JCP.  The Target main parcel was reduced from $18,692,800 to $16,586,200, and the parking parcel was reduced from $2,238,300 to $2,105,300.   These are the lowest values since 2015.   JC Penney was reduced from $10,979,500 to $10,247,500.  This is the lowest value since 2016.  The Assessment history is attached hereto as **Exhibit H** and incorporated herein.

52.     This resulted in absolutely no financial benefit accrued to either Target or JCP nor any decrease in actual taxes retained by the City, but the reduced assessed value materially reduced the real estate taxes/ special tax revenues received by the CDA and, as a direct consequence, First Available Pledged Revenues materially decreased solely to the detriment of the Peninsula Entities.

53.     If the 2020 assessed values of Target and JCP are used instead of the 2021 reduced assessments, the First Available Pledged Revenues would increase by $44,247 in 2021, and by $45,132 and $46,035 in 2022 and 2023, respectively.

- ***Stabilized parcels will undisputedly substantially increase the projection***

54.     Most significantly, since August 27, 2020, the Administrator has acknowledged error, absence or inaccuracy in certain material facts and assumptions related to Peninsula Town Center tenancies on which the August Draft was based.

55.     The Administrator has acknowledged that various parcels in the District were incorrectly assumed to have been stabilized and that the projected assessed values for such parcels must be increased when stabilized, as must projected real estate taxes and special tax revenues relating to same.  The oversight is apparently a miscommunication between the City

and Administrator.  The Administrator has further acknowledged that First Available Pledged Revenues will materially increase as a result of adjustments relating to stabilization of various parcels.

56.     The Administrator has acknowledged that it was unaware of multiple tenants whose sales revenues must be included in the projections to calculate First Available Pledged Revenues.  The Administrator has further acknowledged that First Available Pledged Revenues will materially increase as a result of adjustments relating to the previously unknown tenants.

57.     The Administrator has acknowledged that it failed to include sales increases of tenants starting up (*i.e.,* ramp up) for multiple tenants.  Peninsula Entities asserts that ramp up sales increases must be included in the projections to calculate First Available Pledged Revenues.  Peninsula Entities further asserts that First Available Pledged Revenues will materially increase as a result of adjustments relating to the tenants whose ramp up was understated.

58.     September 2020 email correspondence related to the evolving projections of the Administrator related to tenancies is attached as Exhibits F and **Exhibit I**.

| | **2021** | **2022** | **2023** | **3 Yr Avg** |
|---|---|---|---|---|
| Tropical Smoothie (Missing Sales - existing tenant) | $  20,183 | $  20,586 | $  20,998 | $  20,589 |
| CeeCee's (Missing Sales - new tenant) | $  19,889 | $  50,246 | $  51,251 | $  40,462 |
| Domoishi (Missing Sales - new tenant) | $  7,188 | $  28,750 | $  29,325 | $  21,754 |
| Philly Café (Missing Sales - new tenant) | $  - | $  14,311 | $  14,597 | $  9,636 |
| Smoothie Stop (Missing Sales - new tenant) | $  4,937 | $  19,748 | $  20,143 | $  14,943 |
| Buildings X and S (Missing Sales - new tenants) | $  - | $  62,638 | $  127,782 | $  63,473 |
| Buildings X, K and S (RE Value Under-assessment) | $  - | $  101,065 | $  103,086 | $  68,050 |
| | $  52,916 | $  297,344 | $  367,182 | **$238,908** |

59.     A revision of the August Draft projection that addressed the material inaccuracies in tenancies (even if the COVID Factor and reduced tax assessments are not addressed) means that the projected revenues are sufficient for the Additional Reserve Fund to be released to the

Peninsula Entities. These proposed revisions would result in First Available Pledged Revenues of $4,527,469, an amount that exceeds the $4,442,200 threshold by $85,269 annually, and merits a release of the $1.7M Fund to the Peninsula Entities.

60.     To date, no updated report reflecting the adjustments in the preceding three paragraphs have been incorporated into Administrator's calculation of First Available Pledged Revenues provided to the Peninsula Entities.

- ***Current Discussions***

61.     As of the final preparation of this Complaint, the Administrator had confirmed that the projections in its August Draft should be revised upwards, but had not revised an August Draft or provided confirmation that the First Available Pledged Revenues would exceed the Section 7.9 threshold.

62.     Further, the Administrator had not agreed to remove the COVID Factor, address the reduced City assessments, or include all of the tenancy revisions discussed with the Peninsula Entities.  Defendants have not assured the Peninsula Entities that the $1.7M Fund would not be applied to the 2018 Bonds on September 15, 2020.

63.     The 2018 Bonds are payable by the CDA, not the parcel owners in the District. As that is the case, the application of the $1.7 Fund to the 2018 Bonds benefits primarily if not exclusively the CDA.  Bond balances are attributed to only some of the properties in the District; and even then, the purpose of the attributed balances is to calculate Annual Payment A. Plaintiffs' properties consist of three parcels, two of which *cannot* be subject to the Annual Payment A (i.e., there is no bond balance attributed to such parcels), and the third parcel would have little to no benefit from the reduction of the bond balance attributed to its parcel because no Annual Payment A is projected for future years.

64.     If this Court ultimately finds in favor of Plaintiff, but only after the $1.7M Fund is applied to the 2018 Bonds, a monetary judgment against the CDA for the $1.7M harm suffered by Plaintiffs would be futile as it would result in the CDA assessing Plaintiff and the other owners in the District for the judgement.

## Count 1 – Declaratory Judgment

65.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

66.     Plaintiffs allege a substantial and actual controversy within the jurisdiction of this Court to declare the rights of the Parties under 28 USC § 2201 and Federal Rule of Civil Procedure 57.

67.     The foregoing allegations reflect a controversy over i) the proper disposition of the Additional Reserve Fund, ii) the application of Chapter XIV, iii) the impact of the City's reduced assessment of the Target and JC Penney parcels, and iv) the proper inclusion of accurate information regarding tenancies on the projections, and v) the proper projections required by the MOU, Indenture, and LOM.

68.     These controversies are of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

69.     The Court's judgment will clarify and settle the legal relations at issue among the parties and afford relief from the uncertainty, insecurity and controversy surrounding the disposition of the Additional Reserve Fund.

70.     All necessary parties have been joined before this Court.

71.     All conditions precedent to Plaintiffs' rights to bring this action have been fulfilled, satisfied, waived, or excused.

## Count 2 – Breach of Contract

72.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

73.    Plaintiffs entered into an enforceable contract in the MOU.

74.    The Indenture and LOM are referenced and incorporated within the MOU.

75.    The City and CDA, including the actions of its agent and Administrator, Municap, have materially breached the MOU through, among other things, failing to prepare the reports and projections in conformity with Section 7.9(c) of the Indenture, unilaterally decreasing the assessed value of parcels, and failing to consider accurate tenancy information within various parcels as stabilized.

76.    Defendants have breached their obligations set forth in Sections 7.9 of the Indenture and Sections 3.2.7 and 12.24 of the MOU.

77.    Defendant's material breaches of the contract will cause Plaintiffs material damage in an amount of at least $1.7M.

78.    All conditions precedent to Plaintiffs' rights to bring this action have been fulfilled, satisfied, waived, or excused.

### Count 3 – Temporary Restraining Order and Preliminary Injunction

79.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

80.    Plaintiffs move this Court for a Temporary Restraining Order and Preliminary Injunction for the reasons set forth herein and in the accompanying Motion and Memorandum in Support.

81.    Plaintiffs will clearly prevail on the merits of their declaratory judgment and breach of contract Complaint.  They have alleged a justiciable controversy of sufficient immediacy and reality to warrant declaratory judgment.  The Court maintains diversity jurisdiction over the parties and declaratory judgment is within the Court's discretion.

82.    Plaintiffs have also alleged and provided clear support for their claim that the Administrator's projections of the First Available Pledged Revenues do not conform with the

MOU, Indenture, and LOM and do not accurately identify the value of the underlying parcels and tenancies.

83.     Plaintiffs have no adequate remedy at law and will suffer irreparable harm if the Court does not grant injunctive relief prior to September 15, 2020 because they will lose the $1.7M Fund without recourse for its recovery.

84.     Any purely monetary judgment against Defendants will be paid by a special assessment upon, in part, Plaintiffs, making any monetary judgment futile.

85.     The balance of equities is in the Peninsula Entities' favor and no harm will come to the City or CDA if the Court grants injunctive relief.

86.     The public interest will be served through injunctive relief as it preserves the enforcement of contracts with CDAs and will make available funds for investment in the Peninsula Town Center.

87.     Plaintiffs will post any security required by Federal Rule of Civil Procedure 65(c).

88.     Plaintiffs have joined all necessary parties to this Complaint and have fulfilled all other conditions precedent to their rights to an injunction.

WHEREFORE, Plaintiffs respectfully request that the Court award them judgment as follows:

A.     Entering judgment in favor of the Peninsula Entities and against the City of Hampton and Peninsula Town Center Community Development Authority on Counts 1 and 2, and against all Defendants in Count 3;

B.     Entering an Order declaring that:

i.     The Administrator's analysis and projection of First Available Pledged Revenues as of August 31, 2020 has not been calculated as required under the MOU, Indenture, and LOM;

ii.    The Administrator's analysis and projection of First Available Pledged Revenues as of August 31, 2020 must include the following assumptions and limitations [from Chapter XIV]: (i) There are no … other federal, state, or local laws, regulations, or codes that would prohibit or impair the … operation of the subject properties in the manner contemplated in the LOM ….; (ii) No material changes will occur in … any federal, state or local law, regulation or code affecting the subject properties ….; (iii) The local, national and international economies will not deteriorate ….; and (iv) The subject properties will not be subjected to any war, … or other casualty or act of God;

iii.   The Administrator's analysis and projection of First Available Pledged Revenues as of August 31, 2020 shall include the Target and JCP parcels valued at the assessed values existing prior to the 2020 City decrease in assessed value, plus a 2% per annum increase;

iv.    The Administrator's analysis and projection of First Available Pledged Revenues as of August 31, 2020 shall include: the stabilized values of parcels, sales revenues for all identified tenants; all identified actual and prospective tenants; and include the estimated, ramp-up increases in tenant sales;

v.     The Trustee may not transfer the Additional Reserve Fund to the Prepayment Account (or any other account or person) for the redemption of 2018 Bonds or any other purpose;

vi.    The Additional Reserve Fund should be released and transferred to the Peninsula Entities;

C.     Issuing a Temporary Restraining Order enjoining Wells Fargo from applying or transferring the Additional Reserve Fund to the Prepayment Account (or any other account or

person) for the redemption of 2018 Bonds or any other purpose for a period of fourteen (14) days from issuance of this Order and until the Preliminary Injunction may be heard and decided, and setting forth the statements required by Federal Rule of Civil Procedure 65(b)(2);

D.      Issuing a Preliminary Injunction enjoining Wells Fargo from applying or transferring the Additional Reserve Fund to the Prepayment Account (or any other account or person) for the redemption of 2018 Bonds or any other purpose through final judgment on the Complaint, and setting forth the statements required by Federal Rule of Civil Procedure 65;

E.      Setting the security required under Federal Rule of Civil Procedure 65(c);

F.      Awarding Plaintiffs such other and further relief as the Court deems appropriate.

## VERIFICATION OF COMPLAINT

I, Peyton Millinor, being duly sworn, states as follows:

1.     I am a natural person and reside at 7805 Linwood Ave., Dallas, TX 75209.  I am an agent of AZT Corporation, agent for T Peninsula Axis VA, LLC ("Peninsula Axis"), T Peninsula Hotel VA, LLC ("Peninsula Hotel"), and Peninsula Parking Lot VA, LLC ("Peninsula Parking") ("Plaintiffs," "Peninsula Entities," or "POE").

2.     I have personal knowledge of the statements made in the Complaint, Motion and Memorandum in Support of Injunction.  I have been directly involved with review of the Administrator's projections, the actual and financial status of the Peninsula Town Center, and with correspondence with Defendants.

3.     I swear and affirm that the factual allegations in the foregoing Complaint are true and correct to the best of my knowledge.

And further the affiant said not. _____

STATE OF ___TEXAS_____  )

CITY/COUNTY OF ___DALLAS_____  ) to wit:

I, the undersigned Notary Public in and for the State of ___TEXAS_____ and the City/County of ___DALLAS___, do hereby certify that Peyton Millinor appeared before me and under oath attested to the foregoing Affidavit this ___6___ day of September, 2020.

_____
Notary Public

My Commission Expires: ___OCTOBER 25, 2020___

Registration No.: ___125078878___

DIANA L. CARVAJAL
My Notary ID # 125078878
Expires October 25, 2020

Respectfully submitted,

T PENINSULA AXIS VA, LLC
T PENINSULA HOTEL VA, LLC
PENINSULA PARKING LOT VA, LLC


By: ____/s/ Nathaniel L. Story_____

Nathaniel L. Story (VSB No. 77364)
John P. O'Malley (VSB No. 92439)
HIRSCHLER FLEISCHER
2100 E. Cary Street
Richmond, Virginia  23223-7078
Telephone:     (804) 771-9500
Facsimile:      (804) 644-0957
E-mail:         nstory@hirschlerlaw.com
                jomalley@hirschlerlaw.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of September, 2020, a true copy of the foregoing was

delivered via e-mail where noted below and by UPS, to the following:

| | |
|---|---|
| PENINSULA TOWN CENTER COMMUNITY DEVELOPMENT AUTHORITY<br>Registered Agent<br>Vincent J. Mastracco<br>Kaufman & Canoles, PC<br>150 W. Main Street, Ste. 2100<br>Norfolk, VA 23510<br><br>Mary Bunting, City Manager,<br>as CDA Representative<br>22 Lincoln Street, 8th Floor<br>Hampton, VA 23669<br><br>Arthur E. Anderson, II<br>McGuire Woods, LLP<br>800 East Canal Street<br>Richmond, VA 23219<br>aanderson@mcguirewoods.com | CITY OF HAMPTON,<br>Cheran Cordell Ivery, City Attorney<br>22 Lincoln Street, 8th Floor<br>Hampton, VA 23669<br>cheran.ivery@hampton.gov<br><br>Mary Bunting, City Manager,<br>22 Lincoln Street, 8th Floor<br>Hampton, VA 23669 |
| WELLS FARGO BANK, N.A.<br>Registered Agent<br>Corporation Service Company<br>100 Shockoe Slip, Fl. #2<br>Richmond, VA 23219<br><br>123 S. Broad Street, Ste. 1500<br>MAC Y 1379-157<br>Philadelphia, PA 19109<br>Attention: Corporate Trust Services | MUNICAP, INC.<br>Registered Agent<br>Virginia Professional Services, LLC<br>3850 Gaskins Road, Ste. 120<br>Richmond, VA 23233<br><br>8965 Guilford Road, Ste. 210<br>Columbia, MD 21046<br>Attn: Keenan Rice<br>Keenan.rice@municap.com |

By:  /s/_____
          Nathaniel L. Story

12685203.2  040470.00028